1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    PAUL SINGH, *et al.*,                    Case No.  2:22-cv-01018-JDP

12                    Plaintiffs,              ORDER DENYING DEFENDANTS'
                                               MOTION TO TRANSFER VENUE AND
13          v.                                 PLAINTIFFS' MOTION TO STRIKE

14    WIRELESS VISION, LLC, *et al.*,          ECF Nos. 7 & 15

15                    Defendants.

16

17

18          In May 2022, plaintiffs Paul Singh and 1-Mobile Operators of California, LLC

19    commenced this action in Placer County Superior Court against defendants Wireless Vision, LLC

20    and Ameritel Management, Inc., asserting state law claims based on defendants' alleged breach of

21    written contract.  ECF No. 1-3.  Defendants removed the case to this court, ECF No. 1, and now

22    move to transfer the case to the U.S. District Court for the Eastern District of New York, ECF No.

23    7.[1]

24                                          **Background**

25          According to the complaint, plaintiff Singh formed and solely owned plaintiff 1-Mobile

26    Operators of California, LLC.  ECF No. 1-3 at 3.  Defendant Ameritel held a master license from

27    _____

28          [1] This case is before the undersigned pursuant to the parties' consent.  ECF Nos. 12, 18, &
      21; *see* 28 U.S.C. § 636(c).

                                                   1

T-Mobile to sell, license, and operate T-Mobile retails shops.  *Id*. at 5.  In August 2017, Singh discussed with Ameritel the possibility of entering into an agreement for retail shops selling exclusively T-Mobile services and products.  *Id*.  On August 21, 2017, Singh paid Ameritel a $10,000 "good faith deposit" and signed a written T-Mobile Operator Agreement.  *Id*. at 5-6.  In accordance with the agreement, Singh spent more than $160,000 purchasing equipment and building a store located in Lincoln, California.  *Id*. at 6.

Singh subsequently "began selling T-Mobile service contracts to customers, but all of the sales contracts were with T-Mobile."  *Id*. at 6-7.  He "received commissions calculated as a percentage of certain of the sales he generated after expenses and other fees were deducted by Defendants and T-Mobile."  *Id.* at 7.  The Operator Agreement did not specify how the commissions would be determined, with respect to either the percentages to be paid to each party or the products or service sales that would warrant commission payments.  *Id.*

On January 4, 2021, Singh was informed that defendant Wireless Vision would be assuming oversight of the business from Ameritel.  *Id*.  Plaintiffs allege that Ameritel assigned its interest in the Operator Agreement to Wireless Vision.  *Id*.  On March 30, 2022, Wireless Vision notified Singh that the Operator Agreement was being terminated effective April 30, 2022.  *Id*.  Wireless Vision did not provide a reason for the termination.  *Id*.  Singh was subsequently evicted from the store location and deprived of all of its contents, much of which he purports to own outright.  *Id.* at 8.  He thereafter brought this suit, alleging claims for breach of contract, violation of the California Franchise Relations Act ("CFRA"), violations of the California Labor Code, and unfair business practices under Bus. & Prof. Code § 17200.  *Id*. at 8-14.

On June 10, 2022, defendants removed the case to this court based on diversity jurisdiction.  ECF No. 1; *see* 28 U.S.C. § 1332.  On June 21, 2022, defendants filed the instant motion to change venue, arguing that the case should be transferred to U.S. District Court for the Eastern District of New York pursuant to the Operator Agreement's forum selection clause.  ECF No. 7.  Plaintiffs timely filed an opposition, ECF No. 13, as well as objections to evidence that defendants submitted in support of their motion, ECF No. 15.  Defendants have replied.  ECF No. 19.

2

1    **Motion to Strike**

2        Plaintiffs have filed evidentiary objections and ask that the court strike portions of two

3    declarations that defendants have submitted in support of their motion to change venue: (1) the

4    declaration of Donald Klacking, ECF No. 7-5; and (2) the declaration of Michael Ziegler, ECF

5    No. 7-1.  *See* ECF No. 15.  The court does not rely on the contested portions of either declaration

6    in reaching its conclusion.  Thus, plaintiffs' motion to strike is denied as unnecessary.

7    **Motion to Transfer Venue**

8        A.    Legal Standards

9        Section 1404(a) of Title 28 provides that "[f]or the convenience of parties and witnesses,

10   in the interest of justice, a district court may transfer any civil action to any other district or

11   division where it might have been brought or to any district or division to which all parties have

12   consented."  28 U.S.C. § 1404(a); *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of*

13   *Texas*, 571 U.S. 49, 59-60 (2013).  Typically, a court deciding whether to transfer a cause

14   pursuant to section 1404(a) must consider both public-interest considerations and the parties'

15   private interests, including the plaintiffs' choice of forum.  *Atl. Marine*, 571 U.S. at 62.  The

16   analysis differs, however, when the parties have entered into a contract with a valid forum-

17   selection clause.  *Id*. at 63.  In such case, "§ 1404(a) requires that a forum-selection clause be

18   'given controlling weight in all but the most exceptional cases.'"  *Id*. at 59-60, 62-64 (quoting

19   *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).

20       "Federal law governs the validity of a forum selection clause."  *Argueta v. Banco*

21   *Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996) (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.*,

22   858 F.2d 509, 513 (9th Cir. 1988)).  "Forum-selection clauses are *prima facie* valid[] and are

23   enforceable absent a strong showing by the party opposing the clause 'that enforcement would be

24   unreasonable or unjust, or that the clause [is] invalid for such reasons as fraud or overreaching.'"

25   *Manetti-Farrow*, 858 F.2d at 513 (quoting *M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 10

26   (1972)).  A forum-selection clause is unreasonable if: (1) "the inclusion of the clause in the

27   agreement was the product of fraud or overreaching"; (2) "the party wishing to repudiate the

28   clause would effectively be deprived of his day in court were the clause enforced"; or

1    (3) "enforcement would contravene a strong public policy of the forum in which suit is brought."

2    *Murphy v. Schneider Nat'l Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004) (citing *Bremen*, 407 U.S. at

3    12-13, 15, 18) (other internal citations and marks omitted).  In evaluating a motion to transfer

4    venue based upon a forum-selection clause, the court "must draw all reasonable inferences in

5    favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party."

6    *Id.* at 1138.  "The non-moving party's pleadings need not be accepted as true, however, and [the

7    court] may consider facts outside the pleadings."  *Petersen v. Boeing Co.*, 715 F.3d 276, 279 (9th

8    Cir. 2013) (citing *Murphy*, 362 F.3d at 1137).[2]

9        B.    <u>Discussion</u>

10        Defendants move to transfer this case to U.S. District Court for the Eastern District of

11    New York pursuant to the Operator Agreement's forum-selection clause.  ECF No. 7.  The

12    Operator Agreement provides that:

> The parties hereto consent that any legal or equity proceeding
> brought in connection with, or arising out of, any matter relating to
> this Agreement, and the transaction to which it relates, shall be
> instituted only in federal or state court of competent jurisdiction
> within the State of New York, County of Kings.  The OPERATOR
> hereby irrevocably consents to, and submits to the jurisdiction of,
> the courts of the State of New York, County of Kings, and waives
> any objection it or he may have to wither the jurisdiction or venue
> of such courts.

18    ECF No. 1-3 at 26, ¶ 24.

---

[2] *Murphy* addressed a Rule 12(b)(3) motion to dismiss for improper venue based on a forum selection clause favoring Wisconsin state court.  *See* 362 F.3d at 1138.  The Ninth Circuit has not revisited *Murphy* since *Atlantic Marine*, which held that that forum selection clauses should be enforced under § 1404 rather than under Rule 12(b)(3).  *See* 571 U.S. at 55.  The Supreme Court in *Atlantic Marine* explained that this distinction does not alter the relevant standards, *see* 571 U.S. at 61 (explaining that "because both § 1404(a) and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum") (internal citations omitted), and district courts have broadly continued to apply *Murphy* to motions brought under § 1404(a), *see, e.g.*, *Derosa v. Thor Motor Coach, Inc.*, No. 2:20-CV-04895-SVW-PLA, 2020 WL 6647734, at *3 (C.D. Cal. Sept. 30, 2020); *Smith v. Nerium Int'l, LLC*, No. SACV 18-01088-JVS (PLAx), 2019 WL 3110027, at *10 (C.D. Cal. 2019); *Halcyon Syndicate Ltd., LLC v. Graham Beck Enterprises (PTY), Ltd.*, No. 19-CV-04278-JCS, 2020 WL 4051865, at *19 (N.D. Cal. July 20, 2020).

Plaintiffs argue that the parties' contract, although styled as an Operator Agreement, constitutes a franchise agreement and that therefore its forum-selection clause is void under the California Franchise Relations Act ("CFRA").  ECF No. 13.

Under the CFRA, "[a] provision in a franchise agreement restricting venue to a forum outside this state is void with respect to any claim arising under or relating to a franchise agreement involving a franchise business operating within this state."  Cal. Bus. & Prof. Code § 20040.5.  The statute "expresses a strong public policy of the State of California to protect California franchisees from the expense, inconvenience, and possible prejudice of litigating in a non-California venue."  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  A forum-selection clause "that requires a California franchisee to resolve claims related to the franchise agreement in a non-California court directly contravenes this strong public policy and is unenforceable . . . ."  *Id.*  Therefore, enforcement of the forum-selection clause depends on whether plaintiffs' claims "aris[e] under or relat[e] to a franchise agreement involving a franchise business."  Cal. Bus. & Prof. Code § 20040.5.

Defendants argue that there was no franchise relationship because the Operator Agreement contains a provision disclaiming the existence of a franchise agreement.  ECF No. 7 at 15; ECF No. 19 at 9.  While such a provision is relevant to deciding whether a contract is a franchise agreement, it is not dispositive.  *See Gabana Gulf Distribution, Ltd. v. Gap Int'l Sales, Inc.*, No. C 06-02584 CRB, 2006 WL 2355092, at *7 (N.D. Cal. Aug. 14, 2006) (finding that a contract was a franchise agreement notwithstanding a provision providing that no franchise relationship existed between the parties); Cal. Bus. & Prof. Code § 20010 ("Any condition, stipulation or provision purporting to bind any person to waive compliance with any provision of this law is contrary to public policy and void.").  If the other terms of the Operator Agreement suitably demonstrate the existence of a franchise relationship, such a provision holds little weight.

The CFRA defines a "franchise" as an arrangement by which:

> (a) A franchisee is granted the right to engage in the business of
> offering, selling or distributing goods or services under a marketing
> plan or system prescribed in substantial part by a franchisor; and

(b) The operation of the franchisee's business pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(c) The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Bus. & Prof. Code § 20001.

The Commissioner of Corporations has issued guidelines that are considered prima facie evidence of the definition of franchise under California law.  *See* Cal. Bus. & Prof. Code § 20009; *When Does an Agreement Constitute a "Franchise?"*, Commissioner's Release 3-F, California Commissioner of Corporations (June 1994) (hereinafter "Guidelines").  "While the responsibility for statutory interpretation ultimately rests with the court, the Guidelines, as interpretation of a statute by the officials charged with its administration, are entitled to great weight."  *Thueson v. U-Haul Int'l Inc.*, 144 Cal. App. 4th 664, 671 (2006); *People v. Kline*, 110 Cal. App. 3d 587, 593 (1980).  Whether the agreement amounts to a franchise agreement is "a mixed question of fact and law."  *Macedonia Distrib., Inc. v. S-L Distribution Co., LLC*, No. SACV 17-1692 JVS (KESx), 2018 WL 6190592, at *6 & *8 (C.D. Cal. Aug. 7, 2018) (citing Guidelines, ¶ 1(2)(4)(1)).  Courts are to construe "the CFRA broadly" to effect its purpose of "protect[ing] individuals from the loss of their investments in franchises."  *1-800-Got Junk? LLC v. Superior Court*, 189 Cal. App. 4th 500, 511, 515-16 (2010).

The Operator Agreement easily satisfies the first two elements of the definition.  It provides that plaintiffs "shall sell the Goods at a price determined by T-Mobile or Ameritel Management" in accordance with "T-Mobile standard operating procedures, requirements, guidelines, metrics and the like," and shall refrain from "operat[ing] any other retail locations which engage in the sale of Cellular Services."  ECF No. 14-2 at 3-6; *cf.* Guidelines, ¶ 1(2)(2)(7) (explaining that a marketing plan is present in light of contract provisions "[p]rescribing or limiting resale prices," "[g]iving detailed directions and advice concerning operating techniques," or "limit[s] sale of competitive products").  With respect to the second factor, plaintiff Singh attests that "Ameritel told [him he] would have a branded T-Mobile store" and that the store contained "signs and displays all listing the T-Mobile brand and trademarks."  ECF No. 14 at 2 &

4; *see also* ECF No. 14-2 at 3 (requiring, in the Operator Agreement, plaintiffs to reimburse Ameritel "for the costs of T-Mobile fixtures and signage").  Defendants do not seriously dispute that these first two elements are met.[3]

But there is a dispute as to the third element.  Defendants argue that plaintiffs were not "required to pay, directly or indirectly, a franchise fee."  Cal. Bus. & Prof. Code § 20001(c); *see* ECF No. 19 at 10-14.  Plaintiffs, meanwhile, contend that the $10,000 "Good Faith Deposit" paid to defendant Ameritel on August 21, 2017, constitutes payment of a franchise fee within the meaning of the CFRA.  ECF No. 13 at 12-16.  Plaintiffs also point to a variety of expenses required by Ameritel under the agreement, including the costs of T-Mobile fixtures and signage, payments for the lease, and other costs to "build out" the store that collectively exceeded $160,000.  *Id.* at 13.  Defendants respond that the deposit and other payments were "ordinary business expenses," not franchise fees.  ECF No. 19 at 10 (quoting *Thueson*, 144 Cal. App. 4th at 676).

The CFRA defines franchise fee as "any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including, but not limited to, any payment for goods and services."  Cal. Bus. & Prof. Code § 20007.  The statute requires that the fee exceed $100 dollars annually, and it exempts, *inter alia*, "[t]he payment of a sum of not exceeding one thousand dollars ($1,000) annually on account of the purchase price or rental of fixtures, equipment, or other tangible property to be utilized in, and necessary for, the operation of the franchised business, if the price or rental so charged does not

---

[3] In a hearing before this court, defense counsel asserted that the second element might not be met because defendants are not "affiliates" of T-Mobile.  Under the CFRA, if the other elements of a franchise agreement are satisfied, defendants would be regarded as "subfranchisors" that had been granted an "area franchise": a "contract or agreement between a franchisor and a subfranchisor whereby the subfranchisor is granted the right, for consideration given in whole or in part for such right, to sell or negotiate the sale of franchises in the name or on behalf of the franchisor."  Cal. Bus. & Prof. Code § 20004.  The CFRA provides that use of the term "'[f]ranchise' includes 'area franchise,'" *id.* § 20006, and the Guidelines explain that "the same agreement may constitute both a franchise and a subfranchise," Guidelines ¶ 2.  Thus, whether Ameritel satisfies the definition of "affiliate" need not be decided in this order.

exceed the cost which would be incurred by the franchisee acquiring the item or items from other persons or in the open market."  *Id.* § 20007(e).

For a payment to be a franchise fee, it must be required by the agreement; however, a "nominally optional" payment "may in reality be a required one, if the article for which the payment is made is essential, or if the franchisor intimates or suggests that it is essential, for the successful operation of the business."  Guidelines ¶ 1(2)(4)(7).  "Whether or not a fee or charge is 'required' and whether it is made 'for the right to enter into a business,' is considered a mixed question of fact and law."  *Thueson*, 144 Cal. App. 4th at 671-72 (quoting Guidelines ¶ 1(2)(4)(1)).  The core inquiry is whether expenses are "an investment required by [the franchisor or subfranchisor] for the right to operate a [franchise]," or simply "ordinary business expenses paid during the course of business."  *Id.* at 675-76.  In undertaking such an inquiry, courts bear in mind that a principal purpose of the CFRA, as with most franchise laws, "'is to protect franchisees who have unequal bargaining power once they have made a firm-specific investment in the franchisor.'"  *Id.* at 672 (quoting *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 136 (7th Cir. 1990)).

The $10,000 deposit satisfies the franchise fee requirement.  Although neither party identifies authority that squarely governs whether a deposit can be a franchise fee, the guidelines include a "deposit of money" as an example of a franchise fee.  Guidelines ¶ 1(2)(4)(9).[4]  Plaintiff Singh attests that he was required to pay the deposit as a precondition of entering into the Operator Agreement.  ECF No. 14 at 2.  Although defendants neither expressly concede nor deny that the Operator Agreement was conditioned on payment of the deposit, the "Good Faith Deposit Agreement" indicates that it was: "WHEREAS, [plaintiff] Operator desires to enter into an agreement with [defendant] ATI . . . pursuant to which Operator shall operate the premises . . . the parties hereto agree . . . Operator shall within three (3) days from the Effective Date, but in no

---

[4] The guidelines include a non-exhaustive list of types of payments that the Commissioner's interpretive opinions have found to be franchise fees: "Performance guarantee or deposit; Deposit of money; An initial or set-up fee; . . . Charges for sales kits, brochures, programs, forms, decals, shirts, displays and announcements; Rental or lease fee."  Guidelines ¶ 1(2)(4)(9).

circumstances later than the execution date of the Store lease, pay to ATI the amount set forth on Exhibit A ('Deposit')."  ECF No. 7-3 at 2.[5]  The Deposit Agreement also provides that, "if the Operator declines the opportunity to be a[n] operator for ATI or otherwise fails to enter into a[n] Operator Agreement with ATI, then the deposit will not be refunded to Operator," creating precisely the type of unequal bargaining relationship that the CFRA is intended to regulate.  *Id.* at 2.

Defendants argue that the deposit was used as "a partial credit against the buildout expenses of the Store" and that the money went entirely to third-party vendors for various operational expenses.  ECF No. 19 at 10 (quoting ECF No. 7-3 at 2 (deposit agreement)); ECF No. 19-1 at 2 (declaration of Michael Ziegler, Chief Financial Officer of defendant Ameritel).  They seek to rely on *Thueson*, in which a California court held that the plaintiff's "monthly fee for a local telephone line and directory listing [and] the cost of a local computer terminal"—together costing the plaintiff approximately $40 monthly—"represented nothing more than ordinary business expenses and not an investment required by U-Haul for the right to operate a dealership."  144 Cal. App. 4th at 674-75.

But *Thueson* does not establish that payments for fixtures, operational materials, or other buildout expenses are necessarily excluded from the definition of franchise fee.  To construe *Thueson* in such a way would contravene plain statutory language, which provides that a franchise fee includes "any payment for goods and services," Cal. Bus. & Prof. Code § 20007, and it would render superfluous the $1,000 limit in the statute's exception for "fixtures, equipment, or other tangible property to be utilized in, and necessary for, the operation of the franchised business," *id.* § 20007(e); *cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence,

---

[5] Additionally, a slide titled "Requirements" in a presentation that Ameritel allegedly used to market the business opportunity to Singh includes the following: "Need $10k to be deposited immediately to secure the opportunity and at least 30 days prior to signing any lease."  ECF No. 14-3 at 35.

or word shall be superfluous, void, or insignificant."). [6]  Indeed, *Thueson*'s reasoning demonstrates that the payments in this case are properly understood as franchise fees.

The plaintiff in *Thueson* entered a contract with defendant U-Haul to rent various U-Haul products to the public alongside "party and wedding supplies, lawn and garden equipment, tools, and other miscellaneous items" that his business already rented and sold to the public.  144 Cal. App. 4th at 668.  He asserted that he paid franchise fees in the form of small, monthly charges for a telephone and computer terminal, which, according to the plaintiff, were not "fees he had to pay as a condition to becoming a U-Haul dealer."  *Id.*  He "made no unrecoverable investment in the franchisor, was not required to purchase any inventory, []was not required to purchase services from U-Haul . . . [, and] placed none of his own funds . . . at risk in exchange for the dealership." *Id.*

Here, on the other hand, plaintiff Singh attests that he was required to invest more than $160,000 in the buildout of a T-Mobile store, including more than "$36,000 for required fixtures and products"—well over the $1,000 limit.  ECF No. 13 at 13; ECF No. 14 at 4.  The Operator Agreement confirms that plaintiff was "responsible for all improvement and build out expenses that are either desired by the Operator[,] required under all applicable T-Mobile standard operating procedures[, or] . . . otherwise required by Ameritel Management."  ECF No. 7-2 at 3; *see Boat & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285, 1290 (9th Cir. 1987) (holding that the plaintiff's "purchases of video cassettes, films, floats, banners, posters, and brochures arguably constituted a fee in terms of the Act" because they were made "at the behest of [the franchisor]").

Whereas the plaintiff in *Thueson* placed little if any of his own funds at risk, plaintiff made significant, unrecoverable, and firm-specific investments in a T-Mobile store.  *See Wright-Moore*, 908 F.2d at 136 (explaining that explaining that "firm-specific" investments, such as

_____

[6] The court in *Thueson* did not rely on subsection (e) of Cal. Bus. & Prof. Code § 20007, perhaps because that case also involved consideration of the California Franchise Investment Law, which contains a parallel definition of franchise fee that omits the sub-$1,000 exception. *See Thueson*, 144 Cal. App. 4th at 668; Cal. Corp. Code § 31011 (defining franchise fee as it is used in the CFIL).

training costs, "may be substantial and unrecoverable, locking the franchise into the franchisor").
The Operator Agreement maintains that Ameritel or its successors owns the lease to the premise
and that "[a]ny improvements, fixtures, and/or signage paid for or provided by T-Mobile and/or
Ameritel Management remains the property of T-Mobile and/or Ameritel Management."  ECF
No. 7-2 at 3.  Singh attests that upon termination of the contract, defendant Wireless Vision took
possession of the store and its contents and declined to repay plaintiff for his contributions.  ECF
No. 14 at 7-8.

Defendants downplay Singh's payments, claiming that the payments ultimately went to
third parties.  Whether or not this is so[7], defendants obtained the benefit of the payments: the
premises at issue, including the modifications and upgrades funded by plaintiff's payments,
remained in defendants' possession and control.  This fact renders defendants' insistence that the
payments ultimately went to third parties inapposite.  Even if all the payments were made to third
party vendors, the payments were made for the benefit of the franchisor or subfranchisors,
because the premises and its improvements and fixtures remained in their possession and control.
*See* Guidelines, § 1(2)(4)(8) (explaining that because payments required "under the franchise
agreement for the account of the franchisor are equivalent to payments made to the
franchisor[,] . . . it makes no difference whether payments for the rental of premises are required
to be made by the franchisee to the franchisor as the owner and lessor of the premises, or to a
third-party owner where the franchisor is the lessee, and the franchisee is the sublessee").

Viewing the facts in the light most favorable to plaintiffs and drawing all inferences in
their favor, the record reflects that the deposit and at least some of the other payments at issue
amount to unrecoverable investments in the franchisor that were paid for the right to enter into the
agreement and, as such, constitute a franchise fee within the meaning of the CFRA.  Given that
California law "require[s the court] to construe . . . the CFRA broadly to carry out legislative

---

[7] The issue appears to be disputed.  Plaintiff Singh attests that he paid Ameritel directly
for rent and suggests that T-Mobile and Ameritel may have directly received payments for certain
fixtures and materials.  ECF No. 14 at 3-4.  The Operator Agreement states that "[t]he operator
shall in its name purchase all goods and services required for operation of the location from
Ameritel Management, subject to the requirements of the guidelines."  ECF No. 7-2 at 3.

intent"—namely, to "protect franchisees who have unequal bargaining power once they have made a firm-specific investment in the franchisor," *Thueson*, 144 Cal. App. 4th at 672—plaintiffs submissions suffice to show that the operator agreement constitutes a franchise agreement under the CFRA.

Because the CFRA voids any "provision in a franchise agreement restricting venue to a forum outside this state," Cal. Bus. & Prof. Code § 20040.5, the Operator Agreement's forum-selection clause cannot be enforced in a motion to transfer under § 1404(a), *cf. DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 964 (9th Cir. 2022) (holding that a state law provision granting "employees the option to void a forum-selection clause under a limited set of circumstances[] determine[d] the threshold question of whether [the] contract contain[ed] a valid forum-selection clause"). In the absence of an enforceable forum-selection clause, the court "turn[s] to the traditional § 1404 factors under *Bremen*," such as plaintiff's choice of forum, the convenience of the parties, the location of potential witnesses and evidence, and the familiarity of the forum with applicable laws. *DePuy Synthes*, 28 F.4th at 965-66. Defendants' motion to transfer venue rests solely on the applicability of the Operator Agreement's forum-selection agreement, offering no argument regarding the convenience of the forum under *Bremen*. *See* ECF Nos. 7 & 19. In any case, such an analysis would weigh against granting defendants' motion, since plaintiffs brought their claims in a California court, the claims are based substantially on California law, and the events at issue took place within the Eastern District of California. Defendants' motion to transfer is denied.

Accordingly, it is hereby ORDERED that:

1.  defendants' motion to transfer venue, ECF No. 7, is denied; and

2.  plaintiffs' motion to strike, ECF No. 15, is denied.

IT IS SO ORDERED.

Dated:   __March 31, 2023__                    _____

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28